IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF NEW MEXICO

UNITED STATES OF AMERICA,

      Plaintiff-Respondent,

v.
                                CIV 03-171 JP/KBM
                                CR 00-123 JP, incorporated into
                                CR 01-941 MV

TRAVIS SEAN BOYD,

      Defendant-Movant.

## PROPOSED FINDINGS AND RECOMMENDED DISPOSITION

This matter is before the court on Travis Sean Boyd's motion pursuant to § 2255, memorandum in support, and the United States' response. *See Docs. 1,2.5.* He raises three ineffective assistance of counsel claims: trial counsel failed to properly object and challenge Boyd's allegedly "illegal detention-arrest;" trial counsel failed to assert an *Apprendi* violation on appeal; and trial counsel failed to object when the United States did not file a motion for a downward departure under FED. R. CRIM. P. 35. The United States contends the claims are procedurally defaulted or alternatively without merit.

Having considered the arguments, pleadings, and relevant law, and for the reasons set forth below, I find the motion is not well-taken and recommend that it be denied. Because it is possible to resolve the issues on the pleadings, and the record establishes conclusively that Boyd is not entitled to relief, I find that an evidentiary hearing is not necessary. *E.g., § 2255;* Rule 8(a), *Rules Governing Habeas Corpus Under Section 2255; Trice v. Ward,* 196 F.3d 1151, 1159 (10th

Cir. 1999), *cert. denied,* 531 U.S. 835 (2000).

## I. Factual & Procedural Background

At the time in question Boyd resided in Carlsbad, New Mexico and was no stranger to the Pecos Valley Drug Task Force.  William Sullivan is the commander of the task force.  *Trial Transcript 9/11/00* at 198 (hereinafter "*Transcript 9/11*").  Gerald Holguin is a Carlsbad police officer assigned to the task force.  *Id.* at 99-100.  Mark Payne of the United States Drug Enforcement Administration ("DEA") also worked with the task force.  *See Trial Transcript 9/12/00* at 97-88 (hereinafter "*Transcript 9/12*").

In 1999, Holguin was working with a confidential informant and investigating Boyd.  He and other teams wired a task force car with concealed video/audio equipment.  The confidential informant used the car on a trip he and Mr. Boyd made to El Paso in February to attempt to purchase a kilogram of cocaine.  Their trip was surveilled by teams of officers, including Payne, and their conversations were recorded by the equipment.  The informant and Boyd were unsuccessful in buying any drugs that day.  *See Transcript 9/11,* at 127-143; *Transcript 9/12* at 87-88.

The following day, again under Holguin surveillance, the informant and Boyd purchased five ounces of cocaine and the type of household kitchen equipment used to turn powder cocaine into crack cocaine.  *See Transcript 9/11* at 143.  The car, driven by the informant, was stopped.  Holguin questioned Boyd about his "drug sales, based on a lot of influx of information that we were getting about Mr. Boyd's involvement in drug trafficking."  *Id.* at 144.  He also asked Boyd if he wanted to "work with" Holguin, that is cooperate, *see id.* at 176-78, but apparently Boyd declined, *see id.* at 148-49.  Holguin did not arrest Boyd at that time for two reasons:  (1) the task

force "had initiated a long-term investigation to target individuals in Carlsbad that were springing

up crack houses," and Holguin wanted "to make . . . as big an impact as we basically could;" and

(2) Holguin did not want to compromise the identity and safety of the confidential informant.  *Id.*

at 146.

   On October 1, 1999, early in the day, one of Holguin's confidential informants made a

controlled buy of crack cocaine from Boyd behind a row of apartments.  Holguin did not see

Boyd or the actual exchange of drugs, but his informant told him that the seller was Boyd.  The

transaction was not videotaped or recorded.  *Id.,* at 171-72.  Later that day, Holguin obtained a

search warrant for the row of four apartments where the transaction took place.

   William Stearns and his son, James Stearns, lived in some of the apartment units and had

control over the others.  Around the end of September, Boyd and a juvenile friend brought a

"grenade" into William Stearns' home.  They had it in a shoe box, and he told them to take it

away.  *Transcript 9/12,* at 29-30.  Both Stearns and his son were present when the search warrant

was executed, but Boyd was not at the scene.

   William Stearns and Holguin had known each other for a long time, and Stearns was

cooperative with Holguin during the search.  Stearns explained his and others' involvement in

trafficking cocaine and where items could be found in the apartments.   The officers found crack

cocaine, firearms, ammunition, and a digital scale.  *See id.* at 100-12.   They also recovered

$825.00 from James Stearns, who said the money belonged to Boyd.  *See id.* at 175.  The juvenile

was taken into custody, and James Stearns was arrested, apparently on a warrant for another

matter.

   However, no one else was taken into custody that day because the task force wanted to

seek federal charges based on the items recovered in the search.  *See id.* at 111-12, 175.  After the search, Holguin and Sullivan called Payne, and the DEA and U.S. Attorney's office accepted it for prosecution as a federal case.  They prepared arrest warrants for the Stearns' to be executed along with others in a "roundup" scheduled for October 7, 1999.  *See Transcript 9/12,* at 88-89.

Around October 3rd or 4th, William Stearns overheard Boyd and the juvenile talking about driving to Holguin's house to see what kind of vehicle he drove.  They discussed using the grenade to blow up his vehicle.  William Stearns tried to call Holguin, but could not get in touch with him.  *Id.* at 30-31.

On the morning of Thursday, October 7, 1999, the Stearns were arrested and taken to the Eddy County Detention Center.  William Stearns told Holguin that he needed to be "careful" because there was a "hit" on him, but did not get to speak with Holguin further because he was transported to the DEA office in Las Cruces for a debrief.  *Id.* at 28, 31; *see also Transcript 9/11,* at 113.  There, William Stearns told Payne about three "bombs" and the threat on Holguin's life. James Stearns corroborated the information, so Payne called Holguin, who in turn secured his family.  *Transcript 9/11* at 113; *Transcript 9/12* at 90.

Payne also called Sullivan to advise that he was headed back to Carlsbad with William Stearns to assist in locating the bombs.  En route, Payne relayed sufficient details from William Stearns to enable Sullivan to locate the shoe box.  *Transcript 9/11,* at 91.  The Bureau of Alcohol, Tobacco and Firearms was brought in to take possession of the explosive, which turned out to be a single rifle grenade.  *See id.* at 222-225.  They were concerned that two other bombs were somewhere else.  *Transcript 9/12,* at 93.

Meanwhile, one of the task force arranged to have one of its confidential informants locate

4

Boyd and keep him occupied.  Also, Sullivan was making arrangements to have a municipal arrest warrant for Boyd issued in Artesia, because a task force agent there had a possession of marijuana "case that was completed" against Boyd but not yet filed "in court."  *Transcript 9/11,* at 198-99; *see also Transcript 9/12,* at 93.

At approximately 10:00 p.m., Boyd was arrested on the possession of marijuana state charge and taken to the Eddy County Sheriff's Department in Carlsbad.  There, he was "advised of his Miranda rights at 10:41 p.m., signed an advice of rights form at 10:42 p.m., and thereafter made inculpatory oral and written statements to law enforcement officers."  *United States v. Boyd,* CR 00-123 (*Doc. 53;* Circuit Judge Paul Kelly's findings of fact 2).  He willingly participated in the interview; detailed to the officers his involvement with the Stearns' in a large crack cocaine distribution operation; explained to their satisfaction that there were no more bombs; and indicated that he wanted to cooperate by participating in a controlled buy from his source.

Boyd maintained that he could not be an effective confidential informant if he was placed in county jail that night because everyone would know he had been arrested.  *See Transcript 9/11,* at 114-27,182-84, 204-06; *Transcript 9/12,* at 94-101, 111-12.  "By mutual agreement, Defendant was held in a motel room so that he could assist law enforcement officials in a drug investigation." *United States v. Boyd,* CR 00-123 (*Doc. 53;* Circuit Judge Paul Kelly's findings of fact 3).

"On the afternoon of Friday, October 8, 1999, Defendant was transported to Artesia, New Mexico where he appeared on the municipal warrant." *Id.* (finding of fact 4).  After making his appearance, Boyd was then formally taken into "into federal custody" and taken back to Carlsbad.

*Id.* (finding of fact 5).  Sometime between Friday afternoon on October 8th and Saturday evening

on October 9th, Boyd participated in a controlled buy and continued composing his written

statement.  He was transported to Las Cruces Saturday evening and appeared before me for an

initial appearance on Sunday, October 10, 1999.  *See id.* (finding of facts 5-6); *Motions Hearing*

*Transcript 7/13/00,* at 73-74 (hereinafter "*Transcript 7/13*"); *Transcript 9/12* at 189.

Later, after withdrawing a guilty plea to an information, the United States indicted

Petitioner Travis Boyd on four counts:  possession with intent to distribute fifty grams or more of

cocaine; conspiracy to do the same; carrying a firearm during the commission of the same; and

attempting to kill a witness.  *See United States v. Boyd,* CR 00-123 (*Doc. 34,* clerk's minutes);

*United States v. Boyd,* CR 01-941 (*Doc. 1,* indictment filed 7/5/00).  A jury convicted Petitioner

of the possession and conspiracy counts and acquitted him of the other charges.  *United States v.*

*Boyd, CR 01-941* (*Doc. 14,* verdict, filed 9/13/00).  The Tenth Circuit upheld the conviction on

direct appeal by an order dated March 7, 2002.  *See United States v. Boyd,* 31 Fed. Appx. 601

(10th Cir. 2002).

## II.  Analysis

A very recent Supreme Court case disposes of part of the Government's procedural

default claim.  That is, the ineffective assistance of counsel claims are not defaulted for failure to

raise them in direct appeal.  *Massaro v. United States,* ___ S. Ct. ___, 2003 WL 1916677 *3

(4/23/03) (adopting position of majority of circuits, including the Tenth Circuit decision in

*Galloway,* and holding that "an ineffective-assistance-of-counsel claim may be brought in a

collateral proceeding under § 2255, whether or not the petitioner could have raised the claim on

direct appeal); *see also United States v. Galloway,* 56 F.3d 1239, 1240 (10th Cir. 1995); *United*

*States v. Antillon-Perez,* CIV 02-317 BB/KBM (*Doc. 7* at fn. 1; proposed findings filed 5/15/02).

The decision in *Massaro* is narrow, however, and does not address issue preclusion. Under the Tenth Circuit's decision in *Galloway,* the doctrine of issue preclude does apply to a § 2255 motion, even if the claims are subsequently cast as ineffective assistance of counsel claims in collateral review.[1]   On that basis, I proceed to analyze the merits of the claims.

### A.  Strickland Standard

The two-prong test announced in *Strickland v. Washington,* 466 U.S. 668 (1984) governs ineffective assistance of counsel claims.  *E.g., Mayes v. Gibson,* 210 F.3d 1284 (10th Cir.), *cert.*

---

[1]   For example, in another proposed recommendation, I noted that

> the doctrine of issue preclusion can apply in a first § 2255 motion. That is, if issues have been raised and decided on direct review, they cannot then be relitigated in a § 2255 motion.
>
> > [T]hat an ineffectiveness claim is raised and adjudicated on direct appeal will not procedurally bar an ineffectiveness claim in a proceeding under 28 U.S.C. § 2255, where new reasons are advanced in support of that claim.  It should go without saying that the *identical* reasons in support of ineffectiveness cannot be litigated twice.  That is prevented by the doctrine of issue preclusion.
>
> . . . *Gallowa*y, 56 F.3d [at] 1242-43 . . . (emphasis original) [and in footnote] *See also Cabrera v. United States,* 972 F.2d 23, 25 (2nd Cir. 1992) ("[a]s we have held previously, section 2255 may not be employed to relitigate questions which were raised and considered on direct appeal"); *United States v. Orejuela,* 639 F.2d 1055, 1057 (3rd Cir. 1981) (noting "[o]nce a legal argument has been litigated and decided adversely to a criminal defendant at his trial and on direct appeal, it is within the discretion of the district to decline to reconsider those arguments if raised again in collateral proceedings under 28 U.S.C. § 2255") (citations omitted).

*United States v. Kelly,* CIV 00-1256 MV/KBM (*Doc. 29* at 7, proposed findings filed 5/1/01).

*denied,* 121 S. Ct. 586 (2000).  An ineffective assistance of counsel claim fails if either of the

*Strickland* prongs are not met.  It is entirely appropriate for a habeas court to analyze the

prejudice prong first and exclusively, if that is the easier course.  *E.g., Scoggin v. Kaiser,* 186

F.3d 1203, 1207 (10th Cir.), *cert. denied,* 528 U.S. 953 (1999); *Cooks v. Ward,* 165 F.3d 1283,

1292-93 (10th Cir. 1998), *cert. denied,* 528 U.S. 834 (1999).

      Boyd must first show that counsel's representation was "objectively unreasonable."  *E.g.,*

*Clayton v. Gibson,* 199 F.3d 1162, 1177 (10th Cir. 1999), *cert. denied,* 121 S. Ct. 100 (2000).  In

doing so, he must overcome the "strong presumption" that counsel's conduct falls within the

"wide range" of conduct that is considered to be trial strategy and is deemed "reasonable

professional assistance."  To be constitutionally ineffective, counsel's conduct "must have been

completely unreasonable, not merely wrong."  *Moore v. Gibson,* 195 F.3d 1152, 1178 (10th Cir.

1999), *cert. denied,* 120 S. Ct. 2206 (2000); *see also Hawkins v. Hannigan,* 185 F.3d 1146, 1152

(10th Cir. 1999).

      Boyd must also establish "prejudice" – that is, absent counsel's errors, there is a

"reasonable probability" that the outcome of the trial would have been different.  *Moore,* 195 F.3d

at 1178.  "Reasonable probability" means that confidence in the outcome is undermined. *Foster v.*

*Ward,* 182 F.3d 1177, 1185 (10th Cir. 1999), *cert. denied,* 529 U.S. 1027 (2000).

      When an ineffectiveness claim is based on a failure to raise an issue on appeal, the  inquiry

is as follows:

> In order to succeed on his claim that appellate counsel was
> ineffective, [Petitioner] must first demonstrate that he would have
> been entitled under Strickland . . . to relief for the ineffectiveness of
> trial counsel.  *See Hooks v. Ward,* 184 F.3d 1206, 1221 (10th Cir.
> 1999) ("When considering a claim of ineffective assistance of

> appellate counsel for failure to raise an issue, we look to the merits
> of the omitted issue."). *Strickland,* of course, requires a showing
> that counsel's performance was both deficient and prejudicial to the
> defense. . . .   The relevant question is "whether appellate counsel
> was 'objectively unreasonable' in failing to raise [this claim] on
> direct appeal and, if so, whether there is a reasonable probability
> that, but for his counsel's unreasonable failure to raise these claims,
> [petitioner] 'would have prevailed on his appeal.'" *Neill v. Gibson,*
> 278 F.3d 1044, 1057 (10th Cir. 2001) (quoting *Smith v. Robbins,*
> 528 U.S. 259, 285-86 (2000)), *cert. denied,* 123 S. Ct. 145 (2002).

*Duckett v. Mullin,* 306 F.3d 982, 996 (10th Cir. 2002), *cert. denied*, ___ S. Ct. ___ (4/28/03); *see also Cargle v. Mullin,* 317 F.3d 1196, 1203, n.4 (10th Cir. 2003) ("This court recently rejected the idea that omission of a 'dead bang winner' issue is a *necessary* condition for prevailing on an appellate ineffectiveness claim. *Neill,* 278 F.3d at 1057 n. 5. *Neill's* holding does not undermine the principle that omission of a clearly meritorious issue can be a *sufficient* basis for such a claim.") (emphasis original).

### B.  "Illegal" Detention Claim Was Raised At Trial Level And On Appeal

Boyd contends that federal authorities did not have a warrant for his arrest on the distribution and bomb charges and, instead, used the misdemeanor state charges as a "subterfuge" keep him in extended investigative custody.  He further asserts that he did not voluntarily agree to be held at the motel room – he did so under duress and coercion.  Petitioner claims that federal authorities illegally detained/arrested him, but that his attorney did not adequately argue the point in his motion to suppress.

Except for Petitioner's use of the words "illegal" and "subterfuge" to describe what occurred, the substance of his argument was raised by counsel both before the trial court and on appeal.  In his motion to suppress, among other things, counsel took the position that Boyd was

arrested by federal authorities on the Thursday night he was brought in on the state charges and interrogated by the federal agents until Saturday when Boyd was taken to Las Cruces in the evening.  Counsel also asserted that Boyd told agents he had not slept in three days, was drunk on alcohol, was high on crack, was tired, had a headache, and did not want to give a statement, but that the agents led Boyd to believe that if he cooperated, he would either not be charged or would be given "significant preferential treatment by the government."  *United States v. Boyd,* CR 00-123 (*Doc. 44*).  Counsel contended that as a result of these assurances and lengthy detention, Boyd's will was overborne when he agreed to give incriminating statements and to participate in the controlled buy.  *Id.* (*Doc. 44,* at 3, 5).

Boyd did not testify at the suppression hearing.  Among other things, the testimony presented by the United States revealed that Boyd did not appear to be intoxicated or high nor did Boyd ever tell them that he was under the influence or felt unwell.  Moreover, agents testified that they made no promises and said only that Boyd's cooperation would be conveyed to the United States.  *See Transcript 7/13* at 32-35.

In denying Petitioner's motion to suppress, Circuit Judge Paul Kelly, sitting by designation, specifically found that:  Boyd began making inculpatory statements immediately after receiving, understanding and knowingly and voluntarily waiving his *Miranda* rights;  Boyd "never complained of lack of sleep, or that he was under the influence of alcohol or any controlled substances;" there were no "promises on the part of law enforcement agents which caused the Defendant's will to be overborne;" "Defendant was told that law enforcement would not and could not make any promises;" and by "mutual agreement, Defendant was held in a motel room so that he could assist law enforcement officials in a drug investigation."  Finally, Judge Kelly held

10

that Boyd was not taken into "federal custody" until Friday, after he was arraigned on the municipal charges.  *See United States v. Boyd,* CR 00-123 *(Doc. 53,* findings of fact 2, 3, 5, 7-13).

Judge Kelly therefore concluded under the "totality of the circumstances including the characteristics of the Defendant and the details of the interrogation [that] Defendant's inculpatory oral and written statements were voluntary."  *Id.* (*Doc. 53,* finding of fact 14).  He further concluded that the statements were admissible despite the delay in appearing before me, in relevant part because the voluntary inculpatory statements "were made prior to federal custody." *Id.* (*Doc. 53,* finding of fact 16).

Testifying at trial, Boyd reiterated his assertions about intoxication, promises and undue influence, but at sentencing, Judge Kelly generally found Petitioner's testimony under oath untruthful.  *Sentencing Transcript 1/12/01,* at 16-17.  On appeal, the Tenth Circuit stated that it reviewed the "record under the totality of the circumstances standard " regarding Boyd's oral and written statements after his arrest, and it affirmed Judge Kelly's "determination that Mr. Boyd's statements were voluntary."  I can only presume that the totality of the circumstances reviewed by the Tenth Circuit included the facts Judge Kelly found, above, with one exception.  The Tenth Circuit stated that it did not need to decide when Boyd came into federal "custody," because "a review of the record shows that Mr. Boyd made the majority of his inculpatory statements within six hours of his arrest."  *See United States v. Boyd,* 31 Fed. Appx. 601 (10th Cir. 2002).

Here, Boyd simply attempts to relitigate what was decided at the motion to suppress and essentially affirmed on appeal.  In my view, three critical facts undermine his claim.  First, the timing of the misdemeanor charges was obviously calculated to use to the officers' best advantage

given the situation, but there is no dispute that the charges were themselves were valid.  Second, upon arrest and before any questioning began, Boyd was given and waived his rights.  He immediately started to cooperate before he came into any sort of federal custody.  Third, he stayed in their custody in the motel by agreement.  I find no reason to recommend to Judge Kelly that he change his factual findings now, based on the assertions of someone whom he found to be perjuring himself.

Accordingly, I find that Boyd is precluded from relitigating his first claim because the critical facts underlying it were was raised and decided against him by both the trial court and the Tenth Circuit.  Alternatively, for the reasons stated by the United States, *see Doc. 5* at 7-11, I find the claim without merit.

### C.  Apprendi Does Not Apply

In *Apprendi,* the Supreme Court held that "[o]ther than the fact of a prior conviction, any fact that increases the penalty for a crime beyond the prescribed statutory maximum must be submitted to a jury, and proved beyond a reasonable doubt."  *Apprendi v. New Jersey,* 530 U.S. 466, 490 (2000).  This case does not present a situation where the United States' indictment failed to identify a quantity of drugs.  Indeed, the United States specifically charged Boyd with possession with an intent to distribute "50 grams and more of cocaine base" in violation of 21 U.S.C. § 841(a)(1), which makes such conduct unlawful, and 21 U.S.C. § 841(b)(1)(A) (see subsection iii), which makes such conduct punishable by imprisonment for a minimum of ten years and a maximum of life.  *See United States v. Boyd,* CR00-941 (*Doc. 1*).  Likewise, the jury verdict specifically found Boyd guilty of possessing with intent to distribute "more than 50 grams of cocaine base" as charged in the indictment.  *Id.* (*Doc. 14*).

12

Defense counsel objected to the paragraph of the presentence report that recommended a base offense level of 38, which reflected quantities of drugs in line with William Stearns' trial testimony and, apparently, Boyd's confession. That amount was more than 1.5 kilograms. *See e.g., id.* (*Doc. 22,* at ¶ 3). Defense counsel argued that under *Apprendi,* only 50 grams should apply, thereby lowering the base level to 32 and the potential maximum guidelines sentencing range from 188 months to 365 months. *See id.* (*Doc. 20,* objections to paragraph 21). Judge Kelly disagreed with the *Apprendi* argument and credited William Stearns' testimony. After making an adjustment to the criminal history recommendation, Judge Kelly sentenced Boyd to 300 months for each count to run concurrently. *See id.* (*Doc. 24,* judgment); *see also Transcript 1/12/02* at 15-17.

Boyd argues that under *Apprendi,* the indictment must specifically charge him with the exact amount of drugs that will ultimately be used for sentencing purposes and that counsel should have raised *Apprendi* as an argument on appeal. *See Doc. 2* at 18. His *Apprendi* argument is meritless, however. After *Apprendi,* the Supreme Court in *Harris* reaffirmed the proposition that once a jury convicts of a certain offense, the court can find facts that inform the imposition of a sentence within an authorized range.

> *Apprendi* noted, 'nothing in this history suggests that it is impermissible for judges to exercise discretion -- taking into consideration of various factors relating both to offense and offender -- in imposing a judgment *within the range*. . . . the facts guiding judicial discretion below the statutory maximum need not be alleged int eh indictment, submitted to the jury, or proved beyond a reasonable doubt. . . . The judge may impose the minimum, the maximum, or any other sentence within the range without seeking further authorization from those juries – and without contradicting *Apprendi.*

13

*Harris v. United States,* 536 U.S. 545, 565 (2002) (emphasis original); *see also United States v. Buckland,* 289 F.3d 558, 570 (9th Cir.) (en banc) ("*Apprendi* does not alter the authority of the judge to sentence within the statutory range provided by Congress"), *cert. denied,* 535 U.S. 1105 (2002).

When a jury convicts a defendant of the threshold amount of drugs listed in the indictment, it is permissible for the court to determine where to sentence within the range of ten years to life. Several circuits, including the Tenth, have so held in light of *Harris.*[2]  Having advanced an unavailing *Apprendi* argument, Boyd cannot show that counsel was ineffective or that he was prejudiced by omission of the argument on appeal.

### D.  Departure Motions

After Boyd was arrested, he made a controlled buy from his source.  That person was subsequently arrested and convicted.  Boyd asserts that the DEA agents promised him a reduced sentence for his cooperation, yet the United States did not file a motion to reduce his sentence under Guideline § 5K1.1.[3]  He further contends that his attorney was ineffective because counsel

---

[2]   *See United States v. Ervin,* 2003 WL 343268 (6th Cir. 2/12/03) ("Ervin relies on *Apprendi* . . . . But there is no *Apprendi* error here. The jury found, beyond a reasonable doubt, that Ervin was responsible for the threshold drug amounts charged in the indictment.  Those amounts subjected Ervin to a statutory sentencing range of 10 years to life on counts I and II and five to 40 years on count III. . . . The jury's findings authorized the district court to impose any sentence within that range-- including the maximum, which is what the district court in fact imposed.  Because Ervin did not receive a penalty that exceeded the statutory maximum, *Apprendi* did not require any additional jury findings."); *United States v. Quary,* 2003 WL 256900 (10th Cir. 2/6/03) ("Mr. Quary was indicted and convicted by a jury of conspiring to distribute more than fifty grams of crack cocaine, for which the penalty is ten years to life  . . . .  Because his life sentence is within that prescribed statutory range, it need not be submitted to a jury."); *see also United States v. Hinton,* 57 Fed.Appx. 55, 56, n.1 (3rd Cir. 1/3/03) ("under 21 U.S.C. § 841(b)(1)(A)(iii), the maximum statutory penalty is life imprisonment.  To be sure, sentencing under the guidelines for crack cocaine will not exceed that statutory maximum.").

[3]   Boyd mistakenly refers to FED. R. CRIM. P. 35, see subsection (b), which authorizes the United States to file a motion to reduce a sentence for substantial assistance rendered by a defendant *after*

would not challenge the Government's refusal to file the motion or request that the court depart under Guideline § 5K2.0.

As noted above, Boyd's counsel raised his assertion of promises in his motion to suppress but Judge Kelly specifically found that:  Boyd "never complained of lack of sleep, or that he was under the influence of alcohol or any controlled substances;" there were no "promises on the part of law enforcement agents which caused the Defendant's will to be overborne;" and "Defendant was told that law enforcement would not and could not make any promises."  *United States v. Boyd,* CR 00-123 *(Doc. 53,* findings of fact 12, 13).  The Tenth Circuit affirmed Judge Kelly's "determination that Mr. Boyd's statements were voluntary."  *See United States v. Boyd,* 31 Fed.Appx. 601 (10th Cir. 2002).  As before, because the issue of whether promises were made has already been litigated through appeal, it cannot be relitigated here.

Even if I accept Boyd's assertion that the DEA officers orally made a promise of leniency, there is no dispute that the United States did not enter into a written substantial assistance agreement with him.  In addition, Boyd makes no assertion of a constitutionally-impermissible motive such as race or religion.  More importantly, the United States explains that the sum total of Boyd's assistance was the controlled buy from someone who was already under investigation.  In fact, the government could not use Boyd or his controlled buy in prosecuting the source because Boyd had testified falsely that he was not involved in drug trafficking.  *See Doc. 5* at 16-17.

Because there was no written agreement, no unconstitutional motive, and a rational basis

---

sentencing.  The conduct Boyd asserts as substantial assistance occurred upon his arrest, long before his trial and sentencing.

for the United States not to use Boyd further, Judge Kelly had no authority to consider the alleged substantial assistance on his own or compel the government to file a motion to that effect. *See e.g., United States v. Duncan,* 242 F.3d 940, 944-47, 949 (10th Cir. 2001); *United States v. Burch,* 166 F. Supp. 2d 1319, 1323-24 (D. Kan. 2001) (in context of § 2255 motion). Furthermore, substantial assistance is not a factor that the court can consider under § 5K2.0. *See United States v. Maldonado-Acosta,* 210 F.3d 1182, 1184 (10th Cir. 2000); *Burch,* 166 F. Supp. 2d at 1324. Consequently, counsel was not ineffective for failing to raise a departure under these Guideline sections and Boyd cannot establish a reasonable probability that his sentence would have been different.

Wherefore,

**IT IS HEREBY RECOMMENDED** that Boyd's § 2255 motion be denied and this action be dismissed with prejudice.

---

**THE PARTIES ARE FURTHER NOTIFIED THAT WITHIN 10 DAYS OF SERVICE** of a copy of these Proposed Findings and Recommended Disposition they may file written objections with the Clerk of the District Court pursuant to 28 U.S.C. § 636(b)(1). **A party must file any objections with the Clerk of the District Court within the ten-day period  if that party wants to have appellate review of the proposed findings and recommended disposition.  If no objections are filed, no appellate review will be allowed.**

---

_____
UNITED STATES MAGISTRATE JUDGE